2000 Utah Ct. App. 262

**STATE of Utah, Plaintiff and Appellee,**

v.

**Brian SWINK, Defendant and Appellant.**

**No. 990501–CA.**

Court of Appeals of Utah.

Sept. 21, 2000.

Catherine E. Lilly, Salt Lake Legal Defender Association, Salt Lake City, for Appellant.

Jan Graham, Attorney General, Kris C. Leonard, Assistant Attorney General, Salt Lake City, for Appellee.

Before JACKSON, Associate P.J., and BENCH and BILLINGS, JJ.

## OPINION

BENCH, Judge:

¶ 1 Appellant Brian Swink challenges his conviction for attempted theft. He claims that his Fifth Amendment rights were violated when the trial court refused to suppress statements he made to a counselor at a secure youth facility without first being advised of the right against self-incrimination. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). We affirm.

## BACKGROUND

¶ 2 Swink was incarcerated at Decker Lake, a secure youth facility, on an unrelated offense and was assigned to the Genesis work program. In early January 1999, Swink and another individual walked away from the Genesis program. On discovering Swink's absence, youth corrections authorities issued a fugitive warrant for his arrest. The following day, Swink stole a screwdriver from a grocery store and then used it to steal a mini-van. Later that day, Swink called Decker Lake to turn himself in. A youth corrections officer picked him up and transported him to Decker Lake where he was held on the fugitive warrant. At Decker Lake, Swink was searched and dressed in inmate clothing. As part of the intake procedure, a counselor conducted an interview to determine if Swink had consumed any alcohol or drugs, or was suicidal. Neither the counselor nor the youth corrections officer gave Swink *Miranda* warnings before beginning the intake interview.

¶ 3 The counselor began the interview by asking, "Where have you been, what have you been doing?" The counselor's purpose in asking this question was to evaluate both Swink's answers and demeanor to determine whether Swink was under the influence of alcohol or drugs, and to determine his general mental state. The facility's staff use this

information to decide where an inmate will be housed in the facility and what level of security or medical attention the inmate will require. Swink told the counselor he had made a phone call and been to a mall. The counselor asked again where he had been and Swink said he had made the phone call, been to one mall, and then to another mall. The counselor told Swink there were "holes" in his story and that he should tell the counselor more of what had been going on. At that point Swink said, "I'm going to get in trouble anyway," and told the counselor about the thefts of the screwdriver and mini-van.

¶ 4 Swink said that he left the stolen vehicle running somewhere after a confrontation with security officers at one of the malls. At this point the youth corrections officer, who had picked Swink up and was present during the interview, asked Swink where he had left the vehicle. Swink described the location and the vehicle was recovered.

¶ 5 Swink was charged and, after the trial court denied his motion to suppress his statements to the counselor, entered a conditional plea of guilty to attempted theft. Swink now appeals the trial court's denial of his motion to suppress the statements he made during the intake interview.

## ISSUE AND STANDARD OF REVIEW

■ ¶ 6 The issue this court must review is whether the trial court properly determined that Swink was not subjected to a custodial interrogation for *Miranda* purposes. We review the trial court's factual findings underlying the denial of the motion to suppress for clear error and the conclusions of law for correctness. *See State v. Riggs*, 1999 UT App 271,¶ 7, 987 P.2d 1281.

## ANALYSIS

■ ¶ 7 The test for determining whether an individual is in custody is whether "a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" *Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984) (quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275

(1983) (per curiam)). In *State v. Mirquet*, 914 P.2d 1144, 1147 (1996), the Utah Supreme Court applied four factors to evaluate the issue of custody. Those factors are: " '(1) the site of interrogation; (2) whether the investigation focused on the accused; (3) whether the objective indicia of arrest were present; and (4) the length and form of interrogation.'" *Id.* (quoting *Salt Lake City v. Carner*, 664 P.2d 1168, 1171 (Utah 1983)). Swink insists that our analysis must be based upon these four factors. While these factors are useful in making a custody determination in most situations, they are not particularly helpful where the interrogated individual is already an inmate at a correctional facility.

¶ 8 A correctional facility is without question a police-dominated location and an individual incarcerated there has not only the indicia of arrest but has, in fact, been arrested. Were we to apply the *Mirquet* factors to correctional facilities, there would be little doubt that an individual is in custody and all investigatory questioning within the facility would first require *Miranda* warnings. As pointed out in *Cervantes v. Walker*, 589 F.2d 424 (9th Cir.1978), the *Miranda* decision " 'is not intended to hamper the traditional function of police officers in investigating crime.... General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected [by the *Miranda* decision].'" *Id.* at 427 (quoting *Miranda*, 384 U.S. at 477, 86 S.Ct. at 1629). The *Cervantes* court also held that the *Miranda* decision was not intended to hamper prison administration. *See id.* To require *Miranda* warnings prior to any investigatory questioning within a correctional facility is "not only ... inconsistent with *Miranda* but would torture it ·to the illogical position of providing greater protection to a prisoner than to his nonimprisoned counterpart." *Id.*

■ ¶ 9 Although Swink contends that he was not incarcerated prior to the intake interview at Decker Lake, the facts do not support that contention. Swink's classification while in the Genesis program was that of a Decker Lake inmate assigned to the work program. When he absconded from the program, his inmate status only changed insofar

as he was then a fugitive inmate. His legal status as a Decker Lake inmate did not change even though he had physically absented himself from the unit to which he was assigned. To hold otherwise would imply that custody pursuant to incarceration is an at-will status rather than a compelled one. After he turned himself in and was returned to Decker Lake, Swink was searched, dressed in the inmate uniform, and given the standard interview. Swink's status as an inmate at Decker Lake was certainly not going to change based on the results of his interview with the counselor.

■ ¶ 10 Since Swink's status at Decker Lake was that of an inmate at the time of the interview in question, the *Mirquet* factors are inadequate to resolve whether Swink was "in custody" for *Miranda* purposes. For persons incarcerated at the time of interrogation, the custody question generally turns on the "added imposition" analysis outlined in *Cervantes. Id.* at 428; *see also Leviston v. Black,* 843 F.2d 302, 304 (8th Cir.1988); *United States v. Scalf,* 725 F.2d 1272, 1275 (10th Cir.1984). Even though an individual is incarcerated for an unrelated offense, the individual may still be entitled to *Miranda* warnings. *See Leviston,* 843 F.2d at 304. However, "incarceration does not ipso facto render an interrogation custodial." *Id.* (citing *Cervantes,* 589 F.2d at 427).

■ ¶ 11 In any *Miranda* analysis, whether the encounter occurs on the street, or within the walls of a correctional facility, we must consider whether the individual was "deprived of his freedom of action in any significant way." *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612. Since a prisoner in a correctional facility is obviously not free to leave the facility, we must look for "a change in the surroundings of the prisoner which results in an added imposition on his freedom of movement," or "some act which places further limitations on the prisoner." *Cervantes,* 589 F.2d at 428. The *Cervantes* court offered the following four relevant considerations to be viewed from the perspective of a reasonable prisoner: (1) the language used to summon the inmate, (2) the physical surroundings of the interrogation, (3) the extent to which the inmate is confronted with evidence of his guilt, and (4) the additional pressure exerted to detain the inmate. *See id.*

■ ¶ 12 The intake interview here was clearly not an extraordinary event, but part of the administrative procedures used when any individual is brought to the facility. A youth counselor conducted the interview, not a police officer. Swink had been incarcerated at this facility in the past and certainly could not have thought that this interview was something out of the ordinary.

¶ 13 The only evidence of Swink's guilt in committing the crime came from Swink himself. The purpose of the interview was to find out information that would assist the staff in housing Swink at the facility, not to present him with evidence of his culpability in the vehicle theft. In fact, until Swink revealed the theft, the counselor and youth corrections officer were unaware that he had committed additional crimes while absent from the Genesis program. There is no evidence of any additional pressure exerted to detain Swink during the interview, as he was not even handcuffed. Swink does not contend that he was treated differently than any other inmate in Decker Lake who went through the same intake process.

¶ 14 In *State v. Tibiatowski,* 590 N.W.2d 305 (Minn.1999), a case remarkably similar to this one, a juvenile incarcerated on an unrelated offense made statements without first receiving *Miranda* warnings. *See id.* at 307. The juvenile's case manager came to the correctional facility for a meeting "to discuss placement, an upcoming hearing and to 'talk to him about where [he was and] what he'd be[en] doing when he was on the run.'" *Id.* at 307 (alterations in original). When the case manager inquired whether there was anything else he wanted to tell her, the juvenile responded by confessing to an armed robbery. *See id.* The Minnesota Supreme Court declared:

> We hold that under the circumstances here where there is no evidence of restraint on the suspect's freedom other than that to which the suspect was already subject by reason of his custody for an unrelated offense, the suspect is not in custody for

purposes of *Miranda.* There is no evidence that respondent here was subject to any additional restraint when he confessed, and therefore the necessary ingredient of coercion in *Miranda* was missing. Respondent was therefore not "in custody" for purposes of *Miranda* when he confessed.

*Id.* at 309 (citing *Cervantes,* 589 F.2d at 427).

¶ 15 Similarly, Swink was not subjected to any "additional restraint" when he made the statements he is seeking to have suppressed. After considering the totality of the circumstances surrounding Swink's confession, we conclude that a reasonable prisoner in Swink's position would not feel that there were any additional impositions on his freedom relating to the interview to a degree that would necessitate that the interview be preceded by *Miranda* warnings.

¶ 16 In *United States v. Ritchie,* 35 F.3d 1477 (10th Cir.1994), the court held that "[t]wo requirements must be met before *Miranda* is applicable; the suspect must be in 'custody,' and the questioning must meet the legal definition of 'interrogation.'" *Id.* at 1485; *see also U.S. v. Hatten,* 68 F.3d 257, 261–62 (8th Cir.1995). Because Swink was not "in custody" for *Miranda* purposes, we need not address the interrogation requirement.

## CONCLUSION

¶ 17 Swink's Fifth Amendment rights were not violated · by the absence of *Miranda* warnings during the intake interview. The trial court's denial of the motion to suppress is affirmed.

¶ 18 WE CONCUR: NORMAN H. JACKSON, Associate Presiding Judge, and JUDITH M. BILLINGS, Judge.