2009 UT 10

**H.U.F. and G.F., Petitioners and Appellees,**

v.

**W.P.W., Respondent and Appellant.**

No. 20070610.

Supreme Court of Utah.

Feb. 10, 2009.

Hutch U. Fale, Provo, Nathan E. Burdsal, Salt Lake City, for petitioners.

H. Mifflin Williams, III, Salt Lake City, Claudia McGee Henry, Los Angeles, CA, for respondent.

On Certification from the Utah
Court of Appeals

DURRANT, Associate Chief Justice:

## INTRODUCTION

¶ 1 In this case, W.P.W. ("Putative Father") challenges the adoption of Baby Girl Stine ("B.G.S."), arguing that the district court erred in ordering the adoption of B.G.S. without his consent. H.U.F. and G.F. ("Adoptive Parents") defend the district court's order by arguing that the Putative Father's consent to the adoption was not necessary because he failed to comply with the statutory requirements that give a putative father the right to contest an adoption.

¶ 2 Specifically, the parties raise the following issues on appeal:

(1) Whether the Putative Father's appeal is moot because he appealed only one of two dispositive orders;

(2) Whether Utah's statutory scheme for adoptions violated the Putative Father's due process and equal protection rights, and whether these constitutional challenges were preserved;

(3) Whether the Putative Father complied with Utah Code section 78–30–4.14, which establishes the requirements a putative father must meet before he may contest an adoption;

(4) Whether the district court should have granted full faith and credit to Arizona's Paternity Order;

(5) Whether the district court should have held an evidentiary hearing; and

(6) Whether the Putative Father's appeal is frivolous, warranting the award of attorney fees to the Adoptive Parents.

¶ 3 We affirm the district court's decision.

## BACKGROUND

¶ 4 On or about September 22, 2005, while the Birth Mother was pregnant with B.G.S., she served two men with notice that she intended to place her baby for adoption

through LDS Family Services in Mesa, Arizona. The notice stated that if its recipient wished to assert parental rights to the baby, he was required to initiate a paternity action pursuant to Arizona Revised Statute section 8–106 within thirty days of receipt of the notice. The notice also included the full text of Arizona Revised Statute section 8–106. In addition, the Birth Mother published public notices in Arizona newspapers four times over a period of four weeks between September and October 2005. The public notices were addressed to, "William Patrick Wilks or Nathaniel Davis or John Doe."

¶ 5 In response, the Putative Father filed a Notice of Claim of Paternity with the Arizona Office of Vital Records on September 29, 2005. This filing placed the Putative Father's name on the Putative Father Registry in Arizona. As a registrant, the Putative Father had the right to be identified by the vital statistics office if the office were to receive a search letter regarding the child whom the Putative Father claimed he fathered. Thereafter, the entity assisting in the placement of the child for adoption would be responsible for notifying the Putative Father of any legal proceedings regarding the child. The vital statistics office indicated in a letter to the Putative Father that he must follow the provisions of Arizona Revised Statute section 8–106 to establish paternity.

¶ 6 In February 2006, the Birth Mother filed a petition with an Arizona justice court seeking a protective order against the Putative Father. A hearing was held on the matter on February 7. At the hearing, counsel representing the Birth Mother stated that the Birth Mother "went to Utah to get away from [the Putative Father], and to be up there, and that's where she is, and there's no need for [the Putative Father] to be allowed to harass her." The Putative Father responded, "Yes, um [the Birth Mother] told me when she moved to Utah."

¶ 7 The Putative Father never registered with the Utah Office of Vital Statistics as a putative father.

¶ 8 On February 15, 2006, one hundred and forty-five days after being served with notice that the Birth Mother intended to place her baby for adoption, the Putative Father filed a petition for paternity with the Superior Court of Arizona, Maricopa County. Because the Putative Father failed to properly serve the Birth Mother, the petition was not granted.

¶ 9 B.G.S. was born in Utah on March 4, 2006. Two days later, in the Fourth Judicial District Court of Utah, the Birth Mother willingly relinquished all of her parental rights and responsibilities to the Adoptive Parents. The Birth Mother also stated to the district court that she was not, nor had she ever been, married to the natural father of B.G.S. and that the identity of the father was unknown. Further, she stated that the natural father had not initiated a paternity action in Utah, despite having actual notice that the Birth Mother had moved to Utah and planned to give birth to the baby in Utah.[1]

¶ 10 On March 15, 2006, the Adoptive Parents filed a petition for temporary custody and guardianship and a verified petition for adoption, wherein they indicated that "[p]ursuant to Utah Code Ann. § 78–30–4.14, the consent of the natural mother is the only consent required in order for the Court to grant the instant petition." They further stated that the presumed natural father had actual notice and knowledge that the Birth Mother resided in Utah and that she intended to give birth in Utah. They also stated that the presumed natural father had not registered with the Office of Vital Statistics in the Utah Department of Health, nor had he begun a paternity proceeding in the State of Utah. On March 17, 2006, the district court granted the Adoptive Parents "full and complete custody and guardianship of [B.G.S.] until such time when the Court issues a final

---

1. At first blush, these statements appear contradictory—the natural father is unknown, yet he received actual notice of the Birth Mother's move to Utah. They are reconcilable, however. Because the Birth Mother was having sexual relations with two different men around the time she became pregnant, she was unsure which man was the natural father. Because she gave both men actual notice of her move to Utah, it is accurate to state that the "unknown" father received "actual" notice of the Birth Mother's move to Utah.

order concerning Petitioner's Petition for Adoption."

¶ 11 On April 11, 2006, the Putative Father again petitioned the Superior Court of Arizona, Maricopa County for a declaration of paternity. Again, he failed to properly serve the Birth Mother.

¶ 12 On July 25, 2006, in the Superior Court of Arizona, the Putative Father filed a Voluntary Petition for Order of Paternity signed by the Birth Mother. In an order dated August 2, 2006, the Arizona court "note[d]" that this voluntary petition "resolv[ed] the paternity issue." The court also noted that it lacked jurisdiction to determine custody or child support and ordered that the matter be transferred to Utah for further proceedings.

¶ 13 On July 27, 2006, the Putative Father requested that the Utah court open the sealed Utah file regarding the adoption proceedings. Then, in the Utah court on September 1, 2006, the Putative Father filed an intervenor's response to the petition for adoption. In an affidavit filed with the court, the Putative Father stated that the Birth Mother told him "verbally and by e-mail ... that she would not give affiant's baby up for adoption and that she would always keep in touch with affiant." Further, the Putative Father stated in the affidavit that he "had no knowledge whatsoever, and received no notice whatsoever that [the Birth Mother] resided in Utah and intended to give birth to [B.G.S.] in Utah."

¶ 14 On August 31, 2006, and again on November 27, 2006, the Birth Mother submitted an affidavit stating to the Utah court that she never gave the Putative Father notice that she had moved to Utah or planned to give birth in Utah. With the second affidavit, the Birth Mother included an e-mail that she had sent to the Putative Father on February 14, 2006, one week following the protective order hearing. The e-mail stated, "[my parents] made me tell all my friends and some family that I moved to Utah when I really didn't, nor do I have any intentions of moving to Utah."

¶ 15 On December 12, 2006, the Adoptive Parents moved to dismiss the Putative Father's objection to the adoption and motion to intervene. On February 2, 2007, the district court held a hearing on the matter. Counsel for the Putative Father requested that the matter be argued only on the law and objected to an evidentiary argument. The court declined to determine the type of hearing and, instead, left the matter up to counsel. At the hearing, the parties did not present any evidence. The Putative Father was present, but his counsel did not call him to testify.

¶ 16 On April 17, 2007, the district court issued one ruling that granted the Motion to Strike and the Motion to Dismiss. In the ruling, the district court barred the affidavits submitted by the Birth Mother, finding that they contradicted "the law of the case" and were obtained unethically. Next, the court declined to give full faith and credit to the Arizona court's statement regarding the Putative Father's paternity, finding that the Arizona court lacked jurisdiction to issue an order of paternity; the court also highlighted additional problems with the order itself. Finally, the court ruled that the Putative Father failed to comply with the Utah statutory requirements for out-of-state putative fathers. Accordingly, the court ruled that the Putative Father "lack[ed] standing to challenge this adoption," and "Petitioners' Motion to Strike the Objection and to Dismiss the Motion to Intervene is hereby granted."

¶ 17 The Putative Father appealed, and the court of appeals heard oral argument in the case. After oral argument, but before any decision issued in this case, the court of appeals issued a split decision in *In re K.C.J.*[2] Concerned that its decision in this case might conflict with its decision in *K.C.J.*, the court of appeals certified this case for immediate transfer to us, pursuant to Utah Rule of Appellate Procedure 43(a). In *K.C.J.*, the court of appeals held that where the district court becomes aware of a putative father's interest and desire to participate in the adoption proceeding, the court should allow the father to participate, at least to the extent of

2.   2008 UT App 152, 184 P.3d 1239.

litigating the legitimacy of his right to contest the adoption.[3] We need not reach the issue presented in *K.C.J.*, however, because the Adoptive Parents have not challenged the Putative Father's right to adjudicate whether he may contest the adoption of B.G.S. Rather, the Adoptive Parents make substantive arguments regarding whether the Putative Father has the right to contest the adoption.

¶ 18 We have jurisdiction pursuant to Utah Code section 78A–3–102(3)(b) (2008).

## STANDARDS OF REVIEW

■■■ ¶ 19 The Putative Father challenges the district court's interpretation of Utah and Arizona statutes, the district court's finding that the Putative Father failed to comply with Utah and Arizona statutes, and the constitutionality of Utah's statutory requirements for putative fathers to establish parental rights. We review a district court's interpretation of a statute for correctness.[4] We review a district court's findings of fact under a clearly erroneous standard.[5] And we review a district court's ruling regarding a statute's constitutionality for correctness.[6]

## ANALYSIS

¶ 20 As threshold issues, we first address (1) whether the Putative Father's appeal is moot, and (2) whether the Putative Father preserved a due process and an equal protection challenge. Holding that the appeal is not moot but that the Putative Father failed to preserve a due process and an equal protection challenge, we then address (3) whether the Putative Father complied with Utah Code section 78–30–4.15 (2005),[7] and (4) whether the district court should have given full faith and credit to the Arizona court's paternity order. Finally, we turn to (5) whether the district court should have held an evidentiary hearing, and (6) whether the Putative Father's appeal is frivolous, warranting attorney fees.

## I. THE PUTATIVE FATHER'S CLAIMS ARE NOT MOOT BECAUSE HE CHALLENGED THE SUBSTANCE OF THE DISTRICT COURT'S ONLY RULING

■■ ¶ 21 An argument is moot "[i]f the requested judicial relief cannot affect the rights of the litigants." [8]

■■ ¶ 22 The Adoptive Parents argue that the Putative Father's arguments on appeal are moot because they only address one of two dispositive orders by the district court. Particularly, the Adoptive Parents argue that the Putative Father only contests the district court's order granting the Motion to Dismiss Alleged Biological Father's Objection and Motion to Intervene ("Motion to Dismiss"), without contesting the district court's order granting the Motion to Strike the Objection and Motion to Intervene ("Motion to Strike"). The Adoptive Parents state that these motions served different purposes. The Motion to Dismiss asserted that the Putative Father failed to establish "that he is entitled to any interest or right to intervene." The Motion to Strike asserted that the Putative Father's attempt to intervene was based upon a false assertion of a material fact[9] and should therefore be stricken.

¶ 23 The Putative Father argues in his reply brief that in his opening brief he did challenge the court's order granting the Motion to Strike. In his opening brief, the Putative Father challenged the district court's finding that the Putative Father had

---

**3.** *Id.* ¶ 10.

**4.** *Peck v. State,* 2008 UT 39, ¶ 7, 191 P.3d 4.

**5.** *Glew v. Ohio Sav. Bank,* 2007 UT 56, ¶ 18, 181 P.3d 791.

**6.** *In re Adoption of S.L.F.,* 2001 UT App 183, ¶ 9, 27 P.3d 583.

**7.** This statute has been renumbered and revised since the proceedings of this case. Throughout this opinion, we apply the 2005 version of the statute.

**8.** *Black v. Alpha Fin. Corp.,* 656 P.2d 409, 410 (Utah 1982) (citations and internal quotation marks omitted).

**9.** The Adoptive Parents claim that the Putative Father falsely asserted that he did not know that the Birth Mother was in Utah when in fact he did know she was in Utah.

knowledge that the Birth Mother was in Utah. Although this challenge to the Motion to Strike is not explicit—nowhere does the Putative Father state that he is challenging the Motion to Strike—the challenge is nonetheless substantively briefed. Accordingly, we hold that the Putative Father challenged the Motion to Strike; therefore, the Putative Father's arguments on appeal are not moot.

## II. THE PUTATIVE FATHER FAILED TO PRESERVE HIS DUE PROCESS AND EQUAL PROTECTION CHALLENGES

■ ¶ 24 The Adoptive Parents contend that the Putative Father failed to preserve a due process challenge and an equal protection challenge in the district court. They are correct.

■ ¶ 25 The preservation requirement is found in rule 24(a) of the Utah Rules of Appellate Procedure, which provides, in relevant part, that for each issue raised on appeal, an appellant's brief must include a "citation to the record showing that the issue was preserved in the trial court; or a statement of grounds for seeking review of an issue not preserved in the trial court." [10] To preserve an issue for appeal, the appellant must have raised "a timely and specific objection" before the trial court. [11] We will not address an issue if it is not preserved or if the appellant has not established other grounds for seeking review. [12]

¶ 26 Rather than advancing grounds upon which we may review an unpreserved issue, the Putative Father argues that he preserved in the trial court all of the issues that he raises on appeal. The Putative Father's brief makes the following statement regarding preservation: "The issues raised in this brief were preserved by appellant's documents filed in the district court, including his Petition and Motion to Intervene, and by the

issues discussed by the district court in its Ruling on Motion to Intervene and Motion to Dismiss, dated April 17, 2007." While the brief does not match record citations with specific issues raised, [13] it does at least reference documents wherein the issues should be found.

¶ 27 Reviewing the documents cited by the Putative Father, we conclude that the Putative Father did not preserve a due process challenge or an equal protection challenge. The Natural Father's Objection and Motion to Intervene as Respondent raises the following arguments: (1) the Putative Father complied with Utah's statute that sets guidelines for out-of-state putative fathers to establish their parental rights; and (2) he complied with the Arizona requirements for putative fathers to establish their parental rights. In its ruling, the district court addressed the following issues: (1) whether the Birth Mother's affidavits should be barred, (2) whether full faith and credit should be given to Arizona's statement of paternity, and (3) whether the Putative Father complied with the Utah requirements for out-of-state putative fathers to establish paternity rights. It is clear from our review that neither the Putative Father's challenges nor the district court's rulings consider a due process or equal protection challenge. Accordingly, we will not address these issues on appeal.

## III. THE PUTATIVE FATHER DID NOT COMPLY WITH THE REQUIREMENTS OF UTAH CODE SECTION 78–30–4.14

¶ 28 Before a putative father may establish the right to contest an adoption in Utah, he must meet the requirements outlined in Utah Code section 78–30–4.14 (Supp.2005). One such requirement is that the putative father register with the Utah Office of Vital Statis-

---

**10.** Utah R.App. P. 24(a)(5)(A)-(B) (2008).

**11.** *State v. Low,* 2008 UT 58, ¶ 17, 192 P.3d 867 (emphasis omitted) (citations and internal quotation marks omitted).

**12.** *Id.* ¶ 19 ("When a party fails to preserve an issue for appeal, we will address the issue only if (1) the appellant establishes that the district

court committed plain error, (2) exceptional circumstances exist, or (3) in some situations, if the appellant raises a claim of ineffective assistance of counsel in failing to preserve the issue." (citation and internal quotation marks omitted)).

**13.** The record citation is not at all helpful because it encompasses the entire record.

tics.[14] The statute includes an exception to this requirement, however, if the following circumstances are satisfied: (1) the putative father "resides and has resided in another state where the unmarried mother was also located or resided;" (2) "the mother left that state without notifying or informing the unmarried biological father that she could be located in the state of Utah;" (3) the putative father "through every reasonable means, attempted to locate the mother but does not know or have reason to know that the mother is residing in the state of Utah;" and (4) the putative father "has complied with the most stringent and complete requirements of the state where the mother previously resided or was located, in order to protect and preserve his parental interest and right in the child in cases of adoption." [15]

¶ 29 The Putative Father admits that he did not comply with the statute's general requirements, but he contends that he qualified for the exception. The district court ruled that the Putative Father did not qualify for the exception because he (1) did not comply " 'with the most stringent and complete' " Arizona requirements " 'in order to protect and preserve his parental interest and right in the child in cases of adoption,' " and (2) he knew or had reason to know that the Birth Mother could be located in Utah. We address both of the district court's findings in turn.

A. *The Putative Father Failed to Comply with the Most Stringent and Complete Arizona Requirements*

■ ¶ 30 The district court reasoned that the Putative Father did not comply with the most stringent and complete Arizona requirements established in Arizona Revised Statute section 8–106(G) because he did not

initiate a paternity action within thirty days of receiving notice that the Birth Mother intended to give B.G.S. up for adoption.[16] Arizona Revised Statute section 8–106(G) provides, in relevant part, that each potential father shall be served notice of the planned adoption, and the notice shall inform the potential father that his "failure to file a paternity action pursuant to title 25, chapter 6, article 1," [17] *"within thirty days* of completion of service" [18] of the notice prescribed by this section, "bars the potential father from bringing or maintaining any action to assert any interest in the child." [19]

¶ 31 The Putative Father argues that this language does not actually impose any time limits on putative fathers because the language is couched in terms of a requirement that the birth mother include the language in her notice to the putative father. He further contends that, for policy reasons, the statute cannot possibly bar a putative father from establishing paternity at any time, otherwise if the birth mother decided not to place the baby for adoption, the putative father would be "off the hook for child support." Finally, he argues that the notice he received was ambiguous and therefore did not actually put him on notice of a mandatory thirty-day limit to initiate a paternity action.

■ ¶ 32 The Putative Father's interpretation of the statute is unpersuasive because it produces an absurd result and contradicts the plain language of the statute. When we interpret a statute, " 'we look first to the statute's plain language to determine its meaning.' " [20] We read the plain language of a statute as a whole and interpret its provisions in harmony with other provisions in the same statute and with other statutes

14. Utah Code Ann. § 78–30–4.14 (2005).

15. *Id.* § 78–30–4.15(4)(a)–(d).

16. Ariz.Rev.Stat. § 8–106(G) (2005).

17. *Id.* § 8–106(G)(7).

18. *Id.* § 8–106(G)(3) (emphasis added).

19. *Id.* § 8–106(G)(7); *see also id.* § 8–106(I)(8) (suggesting that the birth mother include the following language in the notice to the putative

father: "If you do not file a paternity action under title 25, chapter 6, article 1, Arizona Revised Statutes, and do not serve the mother within thirty days after completion of the service of this notice and pursue the action to judgment, you cannot bring or maintain any action to assert any interest in the child.").

20. *Oman v. Davis Sch. Dist.*, 2008 UT 70, ¶ 35, 194 P.3d 956 (quoting *State v. Gallegos*, 2007 UT 81, ¶ 12, 171 P.3d 426).

under the same and related chapters.[21] We seek an interpretation that renders all parts of a statute "relevant and meaningful, and interpretations are to be avoided which render some part of a provision nonsensical or absurd." [22]

¶ 33 Contrary to the Putative Father's contention, it would be absurd for the Arizona legislature to require a birth mother to give a putative father notice that he had only thirty days to initiate a paternity action but then give the putative father unlimited time to initiate the action. Such a result would render meaningless the provision in the required notice section. Further, the language of section 8–106 is plain and unambiguously requires a putative father to initiate a paternity action within thirty days of receiving notice of a planned adoption; otherwise, he has no right to contest the adoption. This interpretation is not refuted by policy, as the Putative Father contends. Limiting the time in which a putative father may establish the right to contest an adoption does not limit the putative father's financial obligations with respect to that child if the birth mother chooses not to place the child for adoption. Section 8–106 regards only the right to contest an adoption, not any other rights or obligations that a putative father may have regarding his child.[23]

¶ 34 The Putative Father's final argument, that the notice he received was ambiguous, is incorrect and irrelevant. He argues that two paragraphs in the notice "contradict each other about whether the [Putative Father] *must* or *may* initiate a paternity proceeding in order to establish interest in the child." We hold that the text of the notice was unambiguous. In one place the notice did read that the Putative Father "may" initiate a paternity action, and, in another place, it stated that the Putative Father "must" initiate the action within thirty days in order to retain a right to contest the adoption. This language is not ambiguous; it simply clarifies

that it is not necessary for the Putative Father to initiate a paternity action if he does not desire to do so. However, if he does desire to, then he must do so within thirty days. Even if the notice were ambiguous, the notice included the text of the statute, which indicated that the father *must* initiate a paternity action within thirty days of receipt of the notice in order to establish the right to contest the adoption. Further, when the Putative Father registered with the Arizona vital statistics office, he again received the text of the statute. Therefore, the Putative Father had sufficient notice of the requirement to initiate a paternity action within thirty days of receipt of the notice of a planned adoption.

¶ 35 We uphold the district court's finding that the Putative Father failed to comply with the most stringent and complete Arizona requirements. The Putative Father failed to initiate a paternity action within thirty days of receiving notice of a planned adoption, as required by section 8–106.

### B. The Putative Father Knew or Had Reason to Know That the Birth Mother was in Utah

¶ 36 The district court reasoned that the Putative Father knew or had reason to know that the Birth Mother was in Utah because, at a protective order hearing that was held less than thirty days before B.G.S. was born, the Birth Mother's attorney stated that the Birth Mother "went to Utah to get away from [the Putative Father], and be up there, and that's where she is." The Putative Father responded, "Yes, um [the Birth Mother] told me when she moved to Utah." We will overturn a district court's findings of fact only if they are "clearly erroneous." [24]

¶ 37 The Putative Father argues that he did not know that the Birth Mother was in Utah because he received an e-mail from the Birth Mother one week following

21. *Id.*

22. *Robinson v. Mount Logan Clinic, LLC*, 2008 UT 21, ¶ 9, 182 P.3d 333 (citation and internal quotation marks omitted).

23. Section 8–106 is entitled, "Consent to adoption; who shall consent; waiver; consent to the release of information; notification to potential fathers."

24. *Glew v. Ohio Sav. Bank*, 2007 UT 56, ¶ 18, 181 P.3d 791.

the protective order hearing stating that she had not moved to Utah. To discredit the attorney's statement made at the protective order hearing, the Putative Father argues, "no reasonable unmarried father, seeking to vindicate his paternity rights, would base his actions on the representations of the attorney for a woman who has obtained an order of protection against him." He also argues that he did not know where the Birth Mother was living because the protective order prevented him from contacting her.

¶ 38 Again, the Putative Father's arguments are unpersuasive. Utah Code section 78–30–4.14 requires only that a putative father "have reason to know" that a birth mother was residing in Utah, not that he have actual knowledge. In open court, the Putative Father testified that the Birth Mother told him that she had moved to Utah. This statement is sufficient for the district court to find that the Putative Father had reason to know that the Birth Mother was in Utah. Although the Birth Mother stated a week later in an e-mail to the Putative Father that she had not moved to Utah, the Putative Father still had reason to believe she was in Utah because she had previously told him that she was there, her attorney told him that she was there, and the Birth Mother's statement that she had not "moved" to Utah did not necessarily mean that she was not staying in Utah until the baby was born and placed for adoption. For these reasons, the district court's finding that the Putative Father had reason to know that the Birth Mother was in Utah is not clearly erroneous.

## IV. THE ARIZONA PATERNITY ORDER DOES NOT IMPACT THIS CASE BECAUSE IT WAS UNTIMELY TO ESTABLISH THE PUTATIVE FATHER'S RIGHT TO CONTEST THE ADOPTION

¶ 39 The Putative Father argues that "the Arizona Order of Paternity prevents the adoption of B.G.S. without the [Putative Father's] permission" and that the district court erred in not giving full faith and credit to the paternity order. We hold that the district court did err, but the error was harmless because the Arizona paternity order has no impact on the Putative Father's unestablished right to contest the adoption.

### A. The District Court Committed Harmless Error When It Failed to Give Full Faith and Credit to the Arizona Paternity Order

¶ 40 "Pursuant to the United States Constitution, 'Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State.'"[25] Specifically, we "give full faith and credit to a declaration of paternity or denial of paternity effective in another state if the declaration or denial has been signed and is otherwise in compliance with the law of the other state."[26]

¶ 41 The district court declined to give full faith and credit to the Arizona paternity order because the district court found that "the Arizona Court now recognizes that it lacked jurisdiction," and "[t]his Court, not the State of Arizona, has exclusive jurisdiction regarding custody of [B.G.S.]."[27]

25. *Mori v. Mori*, 931 P.2d 854, 856 (Utah 1997) (quoting U.S. Const. art. IV, § 1).

26. Utah Code Ann. § 78B–15–310 (2008).

27. The district court also found two more problems with the order.

First, the court found that the order was a "nullity" because it was issued after the Birth Mother relinquished her rights to B.G.S., and, accordingly the Putative Father lost any right to contest the adoption. We agree. The paternity order was a "nullity" as it pertains to whether the Putative Father may contest the adoption of B.G.S. However, that determination does not mean that we decline to give the order full faith

and credit. As our analysis indicates, the right to establish paternity is a separate and distinct right from the right to contest an adoption. The establishment of paternity is only one of many requirements that a putative father must satisfy before he establishes the right to contest an adoption. In this case, the Putative Father failed to meet the additional requirements, therefore it is irrelevant whether he was able to establish paternity.

Second, the district court stated that the order does not "solicit[] judicial confidence" for a myriad of technical reasons. Specifically, the court was concerned that the order was not executed by a judge; the copy provided to the Utah court was not certified; the copy was handwritten by the Birth Mother; and the order was

¶ 42 As to matters of jurisdiction, a judgment is entitled to full faith and credit "if the same issue as to jurisdiction was raised in the foreign court and adjudicated therein."[28]  In this case, the Arizona court did take testimony and consider its jurisdiction.  The Arizona court stated as follows in its order:

> After discussion with the parties present, the Court elicits testimony under oath on the record in open court that the minor child ... does not reside in the state of Arizona and has not resided in the state of Arizona for the past six (6) months.
>
> Pursuant to A.R.S. § 25–1031, this Court does not have jurisdiction to determine *custody* at this time.

(Emphasis added.)

¶ 43 However, the Arizona court did not find that it lacked jurisdiction to issue a paternity order; rather the court stated that the Voluntary Petition for Order of Paternity "resolv[es] the paternity issue."  The court then ordered the matter transferred to Utah "for all further proceedings."  A lack of jurisdiction as to a custody determination does not equate to a lack of jurisdiction as to a paternity determination.  A "child custody determination" is "any judgment, decree or other order of a court, including a permanent, temporary, initial and modification order, for legal custody, physical custody or visitation with respect to a child."[29]  A determination that an individual is the biological father of a child is not a determination that the biological father has custody or visitation rights with respect to that child.  Accordingly, the Arizona court concluded that it lacked jurisdiction to determine custody but not to determine paternity.

¶ 44 Being aware that the Arizona court had itself concluded that it had jurisdiction, the Utah district court erred in addressing the question of whether the Arizona court, in fact, had jurisdiction.  However, the error was harmless.  "[H]armless error is an error that is sufficiently inconsequential that there is no reasonable likelihood that it affected the outcome of the proceedings.'"[30]  In this case, the district court's error in declining to grant the Arizona paternity order full faith and credit was harmless because the order has no bearing

amended by the Arizona court, but the Putative Father failed to present the amended order to the district court.  None of the reasons stated by the district court is supported by evidence that the order failed to comply with Arizona law, which is the only requirement we must consider in a full faith and credit analysis.  Rule 58(a) of the Arizona Rules of Civil Procedure requires only that, "all judgments shall be in writing and signed by a judge or a court commissioner duly authorized to do so."  The Paternity Order in this case was in writing and signed by the deputy clerk.  No one has argued that a deputy clerk is not authorized to sign an order.  Further, no other Arizona requirements have been brought before us.  Accordingly, we conclude that the Arizona requirements have been met.

28. *In re Complaint Against Smith*, 925 P.2d 169, 172 (Utah 1996) (citation and internal quotation marks omitted).

29. Ariz.Rev.Stat. § 25–1002(3)(a) (Supp.2008).

The Adoptive Parents look to Arizona Revised Statute sections 25–1031 and 25–1002 to argue that the Arizona court lacked jurisdiction to issue the paternity order.  Section 25–1031(A)(1)–(2) states that Arizona does not have jurisdiction to "make an initial child custody determination" unless Arizona is the child's home state, and a court of another state does not have jurisdiction over the child.  Section 25–1002(4) defines "child custody proceeding" as "a proceeding, including a proceeding for divorce, separation, neglect, abuse, dependency, guardianship, *paternity*, termination of parental rights and protection from domestic violence, in which legal custody, physical custody or visitation with respect to a child is an issue or in which that issue may appear." (Emphasis added.)  Thus, the adoptive parents argue that when the Arizona court stated that it lacked jurisdiction to determine custody, it was also stating that it lacked jurisdiction to adjudicate paternity because a custody proceeding is statutorily equivalent to a paternity proceeding.  However, the jurisdictional statute regards a "child custody determination," not a proceeding.  Ariz.Rev.Stat. § 25–1031(A).  Further, the definition of a "child custody determination" does not incorporate a paternity determination: a child custody determination is "any judgment, decree or other order of a court, including a permanent, temporary, initial and modification order, for legal custody, physical custody or visitation with respect to a child." *Id.* § 25–1002(3)(a).  Therefore, a lack of jurisdiction over a custody determination does not equate to a lack of jurisdiction over a paternity determination.

30. *State v. Spillers*, 2007 UT 13, ¶ 24, 152 P.3d 315 (alteration in original) (quoting *State v. Evans*, 2001 UT 22, ¶ 20, 20 P.3d 888).

on the Putative Father's right to contest the adoption of B.G.S.

### B. The Arizona Paternity Order Has No Impact on the Putative Father's Right to Contest the Adoption of B.G.S.

¶ 45 We hold that a declaration of paternity from Arizona does not necessarily establish the right to contest an adoption in Arizona. Rather, the right to contest an adoption is a more narrow right that must be established through specified means.

¶ 46 In Arizona, a putative father must initiate a paternity action within thirty days of receiving notice of the planned adoption in order to establish the right to contest an adoption.[31] If the putative father fails to initiate a paternity action within the time specified, then he is barred "from bringing or maintaining any action to assert any interest in the child."[32] This language is found within the statute entitled, "Consent to adoption; who shall consent; waiver; consent to the release of information; notification to potential fathers."[33]

¶ 47 The Putative Father argues that because the Arizona court, having jurisdiction to do so, issued an order declaring him to be B.G.S.'s father, he need not meet the thirty-day requirement. This is not the case. This interpretation of Arizona law would render the thirty-day requirement meaningless. Under Arizona law, the right to contest paternity is distinct from the right to contest an adoption. A putative father may establish paternity at any time, but he may only establish the right to contest an adoption if (1) he initiates a paternity action within thirty days of receiving notice of a planned adoption and (2) that action results in a paternity order.

¶ 48 Accordingly, we can consistently give full faith and credit to the Arizona paternity order, but nevertheless hold that the Putative Father did not establish the right to contest the adoption of B.G.S.[34] In failing to

give the paternity order full faith and credit, the district court committed error. But that error was harmless because the paternity order alone is insufficient to establish the right to contest the adoption.

## V. THE DISTRICT COURT DID NOT ERR IN FAILING TO HOLD AN EVIDENTIARY HEARING

¶ 49 The Putative Father contends that the district court erred in finding facts without holding an evidentiary hearing.

¶ 50 Pursuant to rule 43(b) of the Utah Rules of Civil Procedure, "[w]hen a motion is based on facts not appearing of record the court may hear the matter on affidavits presented by the respective parties, but the court may direct that the matter be heard wholly or partly on oral testimony or depositions."

¶ 51 In this case, the court provided the parties the opportunity to present evidence. On February 2, 2007, the district court held a hearing on the matter. Counsel for the Putative Father requested that the matter be argued only on the law and objected to an evidentiary argument. The court declined to determine what type of hearing would be held and left the matter up to counsel. At the hearing, the parties did not present any evidence. The Putative Father was present, but his counsel did not call him to testify. Subsequently, the court relied on facts in the record to make its findings.

¶ 52 We hold that the district court did not err in failing to hold an evidentiary hearing. The court provided the parties an opportunity to present evidence, but counsel for the Putative Father declined. Further, the court relied only on facts in the record to make its findings.

## VI. THE PUTATIVE FATHER'S APPEAL IS NOT FRIVOLOUS

¶ 53 The Adoptive Parents argue that the Putative Father's "appeal is frivolous as it is

---

**31.** Ariz.Rev.Stat. § 8–106(G)(3) (2005).

**32.** *Id.* § 8–106(G)(6).

**33.** *Id.* § 8–106.

**34.** This situation should not arise in Utah because here, "a declaration of paternity may not be signed or filed after consent to or relinquishment for adoption has been signed." Utah Code Ann. § 78B–15–302(8) (2008).

not grounded." The Adoptive Parents base their argument on the following claims: (1) the Putative Father's claim is moot because he only challenged one of two dispositive orders; (2) the Putative Father makes arguments on appeal that he failed to preserve; (3) the Putative Father challenges findings of fact without fully marshaling the evidence that supports those findings; (4) the Putative Father ignores the essential fact he admitted to the court at the protective order hearing—that he knew the Birth Mother went to Utah; and (5) the Putative Father challenges the lack of an evidentiary hearing when it was counsel for the Putative Father who declined an evidentiary hearing.

¶ 54 The Adoptive Parents' arguments fail to establish that the Putative Father filed a frivolous claim. A frivolous claim under rule 33(b) of the Utah Rules of Appellate Procedure "is one that is not grounded in fact, not warranted by existing law, or not based on a good faith argument to extend, modify, or reverse existing law." We address each of the Adoptive Parents' arguments in turn.

¶ 55 First, the Putative Father did challenge the substance of both the Motion to Strike and the Motion to Dismiss, therefore his claim is not moot. Second, although the Putative Father failed to preserve two of the issues that he raises on appeal, he still raises other issues that are properly before us for consideration. Third, the Adoptive Parents have not developed a marshaling argument, and failure to marshal is not included in rule 33(b)'s definition of a frivolous appeal. Fourth, the Putative Father has admitted that he stated at the protective order hearing that he knew, at the time, that the Birth Mother was in Utah. He contends, however, that he did not know or have reason to know the Birth Mother was actually in Utah because following the protective order hearing the Birth Mother sent him an e-mail wherein she stated that she had not moved to Utah. While this may not be a strong argument, it does not appear to be a bad faith argument, especially in light of the fact that the Putative Father has submitted the e-mail for the court's review.

¶ 56 Finally, the Putative Father's challenge to the lack of an evidentiary hearing does not appear to be made in bad faith. The Putative Father contends that the district court ruled on facts that the Putative Father did not know were in dispute. Particularly, the district court found that the copy of the Arizona Paternity Order submitted by the Putative Father was not properly certified. The Putative Father argues on appeal that the district court should have provided him an opportunity to submit evidence regarding the validity of the Order before the court ruled on the Order. This appears to be a good faith argument, although it is irrelevant because, as we have stated earlier, the validity of the order has no bearing on the outcome of the case.

¶ 57 Accordingly, we hold that the Putative Father's appeal is not frivolous, even though we uphold the district court's decision.

## CONCLUSION

¶ 58 We affirm the district court's decision. Specifically, we hold that (1) the appeal is not moot because the Putative Father challenged the substance of the two motions; (2) the due process issue and the equal protection issue are not properly before us because the Putative Father failed to preserve them; (3) the Putative Father failed to comply with Utah Code section 78–30–4.14; (4) the district court committed harmless error when it declined to give the Arizona Paternity Order full faith and credit; (5) the district court provided the opportunity for an evidentiary hearing; and, finally, (6) the Putative Father's appeal is not frivolous.

¶ 59 Affirmed.

¶ 60 Chief Justice DURHAM, Justice WILKINS, Justice PARRISH, and Justice NEHRING concur in Associate Chief Justice DURRANT's opinion.

